PAVY, Judge.
This is a suit by Mrs. Sam Farace (hereinafter usually designated as plaintiff) and her husband (who joined to assert the medical expense claim) for damages arising out of an automobile accident on July 24, 1973. The trial judge awarded the wife $40,000 for her injuries and $6,323.44 to the husband for medical expenses. Mrs. Farace was a guest passenger in a car which collided at an intersection with one driven by an insured of Government Employees Insurance Company, the other defendant. Both defendants have appealed. They did not contest the issue of liability and direct their arguments solely to the matter of quantum.
The evidence shows that the accident was of sufficient force to throw plaintiff against the windshield and stun or daze her if not actually render her momentarily unconscious. Her original complaints consisted of pain in the head, neck and hip. The hip injury has passed out of the picture. She was hospitalized for a week.
Her family physician, Dr. Wesley Dyer, treated her initially and, off and on, during most of the times involved. In August, he referred her to Dr. Louis Cayer, an Alexandria orthopaedist, who treated her until November 28, 1973. On October 31, 1973, at Dr. Cayer’s suggestion, Mrs. Farace was examined by Dr. F. C. Boykin, a Shreveport neurosurgeon. On December 28, 1973, she consulted Dr. Homer Kirgis, a neurosurgeon at the Oschner Clinic in New Orleans. He treated plaintiff conservatively until September, 1974, when he operated on her and removed the intervertebral disc at the 5th cervical level and fused the two adjoining vertebrae with a piece of bone from the hip.
On December 2, 1974, subsequent to the operation and shortly before the trial held on January 9, 1975, Mrs. Farace was examined by Dr. Richard Levy, a New Orleans neurosurgeon. All the aforementioned experts had examined or treated plaintiff and testified in the case. Additionally, two radiologists, Dr. Lawrence Heard of New Orleans and Dr. R. O. Chadwick of Alexandria, neither of whom had seen or treated plaintiff, testified as to their interpretations of x-rays, a myleogram and a disco-gram, which latter two were performed on plaintiff at the Oschner Clinic.
It is defendants’ argument that, prior to the accident, plaintiff suffered from degenerative changes in neck and shoulder area, and that she suffered some type of cervical strain injury but not a disc involvement as a result of the accident; and that, although she may be entitled to a substantial sum for the pain, suffering etc., the award should not be based on a disc injury and should be substantially lower than the $40,000 awarded.
At the time of the accident, Mrs. Farace was 52 years of age and had been an active housewife and frequently assisted her husband at his store. She had no trouble or complaints of pain in the neck, shoulder, head or arm. Since the accident, she has constantly complained of pain in those areas except that the arm pain was not constant and late in manifesting itself. None of the doctors doubted her sincerity or thought her complaints were not genuine except that there were a few expressions by the experts that her complaints were slightly out of proportion to the findings. She was treated with muscular relaxants, analgesics, heat (lamps and soaks), hospital and home traction, cervical collar and shoulder harness.
Specifically, defendants argue that the weight of the clinical findings by the ex *402 perts, the correct interpretation of the x-rays, myleogram and discogram and the information, or lack of it, from the operation rule out any disc injury whatsoever and, especially, because of the time factor, rule out any disc involvement resulting from the accident.
It is true that the experts who examined plaintiff in the first phases of her problem diagnosed her condition as one other than a disc problem but none of these definitely ruled out such a possibility. Also, although most of the experts thought that any disc injury would manifest itself within the first several months subsequent to the accident, none would deny a causal relationship between the accident and an actual disc condition if there was no indication of a disc problem prior to the accident, there was constant complaints of the kind Mrs. Farace experienced subsequent to the injury and an operation actually revealed a disc involvement. There is reliable expertise in the record that a progression of the condition from the complaints of Mrs. Farace during the first few months to actual disc involvement at time of operation is not atypical.
The x-rays showed degenerative (aging process) changes which probably existed prior to the accident. They (the x-rays) were not indicative of any disc involvement, but it is clear that x-rays never rule out a disc problem. Most of the experts interpreted the myleogram to be negative, but it is shown that there are false negatives, the exact frequency of which is uncertain. A discogram is a diagnostic device in which dye is injected into the suspected disc itself. If the visualized dye exudes or shows the disc sac to protrude it is considered that the disc is pathological. Additionally, the injection of the dye into the disc sac is supposed to reproduce the complained-of pain if the disc is pathological. The determination of whether the pain is reproduced is made by the neurosurgeon attending the discogram. The report on the discogram shows that it resulted in reproduction of shoulder and neck pain. The report of the discogram by the radiologist attending the discogram and Dr. Kirgis’ interpretation of the discogram x-ray confirmed a bulging of the disc. The other testifying experts, who were not in attendance at the discogram, could not express themselves one way or the other with regard to the question of the pain reproduction. On the question of whether there was a bulging or exuding shown on the discogram x-rays, some of the experts (even radiologists), refused to express themselves because of their inexperience in, or skepticism toward, discography or because they thought the technique in the particular instance involved was not sufficient to justify a decision. Other experts interpreted the discogram film to be negative. While there may be doubt as to the discogram film interpretation, the evidence that the complained-of pain was reproduced stands uncontradicted and this evidence is supportive of a disc involvement condition.
The evidence shows that in a cervical disc operation there are two methods of gaining access to the disc. One is anteri-orly, from the front of the neck, and the other is posteriorly, from the rear of the neck. Both are accepted techniques in the medical profession. The anterior approach is the more preferred one and was used by Dr. Kirgis. Dr. Levy, defendants’ main expert on this aspect of the case, employs the posterior approach.
Defendants argue that in the anterior approach it is impossible for the surgeon to determine that the disc actually impinges on the nerve root because the disc is cut out before the nerve root, located to the rear of the disc, is visible; that in this case Dr. Kirgis could not testify that the disc impinged against the nerve root and there is a lack of proof that plaintiff had a disc problem.
We think defendants’ argument does not give accurate appraisal to the testimony and the reasonable inferences to be drawn *403 therefrom. On direct examination, Dr. Kirgis testified as follows:
“Q. When you went through the operative procedure and laid the facia open and were able to look at the site of the disc at the C-5 level, were you able — and you know, after you moved away the muscles or the ligaments, or the fibers that cover the area, were you able to see the ruptured disc in that location, Doctor ?
A. Yes.
Q. How did you remove it? Do you have a surgical instrument that goes in there ?
A. Yes, sir.
Q. And you did at that time remove the pathological disc material ?
A. Yes, sir.
Q. Are you able to visualize the nerve root that emanates from that area at that time, too ?
A. Yes, sir.
Q. Are you able to recall if you could tell whether it was pressing against the nerve root, the disc material ?
A. Well, this is a- — it’s not as easy to determine as — in the cases in which we use the so-called posterior approach. We can tell if the disc is pathologic. But as far as determining at the operation the degree of compression of the nerve, it is not as easily done as —this is not as easily determined from the posterior approach. We remove all of the disc in order to be certain that the nerve is unimpinged.
Q. Is this the usual procedure, Doctor, the anterior approach or is that a relatively new surgical procedure ?
A. We have been doing it for ten or twelve years.
Q. What is the advantages over it as compared to the posterior approach?
A. It’s very advantageous in several ways.
No. 1, we can remove the disc completely from the anterior approach, which we can’t from the posterior approach.
No. 2, we can do this procedure with much less danger of damage to the nerves or to the spinal cord. And
No. 3, there is much less discomfort post-operatively than with the posterior approach. For instance, the patients are usually out of bed either later the day of the operation or later on the day after the operation. And the entire course is usually more satisfactory than with the posterior approach.”
On cross-examination this doctor testified as follows:
“Q. Now, Doctor, what we’re concerned with in this case is whether or not the accident of July 24th, 1973 caused the — any rupture or disturbance of the disc that you later took out? As I appreciate what you said, you go in the front to take the disc out, is that correct ?
A. Yes, sir.
Q. And the bulge that you believe was observed as a result of this myelo-gram was a bulge to the rear or posterior of the cervical spine, is that correct ?
A. Yes.
Q. And I think that what you were telling us earlier when you did the operation, you don’t actually see and observe the bulge, do you, in this particular lady, let’s say, because that’s all we’re really concerned about.
*404 Well, what I said was when we do the operation from the anterior approach we have removed parts of the disc before we reach the back of the disc. >
That’s correct. ©
So we can’t say — describe the degree of protrusion that we see at the operation like we can if we do this operation from the back. >
From the back. All right. Specifically as a matter of fact you can’t see the bulge at all when you go in from the front because you have cut it out by the time you have gotten there, haven’t you? a
Well, sometimes we can see it if there has been a large protrusion so that this part that has escaped from the disc space has become almost or completely separated from the rest of the disc. But in a case of this sort we don’t see that. >
Okay. So what you did really was you cut aloose the skin and the ligaments and all the things that cover the spine and then, you are able to observe the two vertebrae or particularly the two vertebrae that you’re after and you also see the disc material there right in front of you ? a
That’s correct. >
Now, you begin to cut it out and get rid of it? ©
Yes, sir. But we can tell by the manipulation of the spine whether or not the disc is pathological. >
Q. Well, I am not saying that it was not pathological. I know when you looked in there and you saw and decided that it was pathological ?
A. Yes.
Q. But you could not see from the position that you were in any bulging from the rear of the spine of the disc?
A. No, sir.
Q. All right. Now, is there any way, Doctor, other than the complaints that the patient had to you at the time you saw her and the period that you did observe the lady to say with any certainty that this accident caused the pathological condition that you later operated on ?
A. Well, of course I can’t say with complete certainty. But the x-ray films of the cervical spine in this case won’t demonstrate any changes that we sometimes see in the cervical spine and with which we can say without any doubt that the disc was injured originally a year or more before the accident. Her- — the x-ray films of her spine don’t show such changes. So we can say that the injury to the disc was relatively recent.
Q. Well, aren’t we in this case talking about a degenerated disc condition?
A. No. That’s precisely what I am saying. We don’t see the changes that are described as a degenerated disc.
Q. So in other words, it is your judgment that that lady’s disc at the time of the operation was not what you would consider to be a degenerated disc situation ?
A. That’s correct.
Q. All right. Were you able by looking at the disc material that you took out to discern if the material itself was damaged as a result of any accident?
A. Well, I can tell it was damaged. But I can’t tell whether it was damaged because of the accident or what damaged it.
Q. Well, when you got it out I guess it was all cut up because of the procedure that you had to apply ?
A. Well, we can tell by the consistency of the disc and the gross appearance of *405 whether it had been damaged or has been injured in some way.
Q. Okay. Did the report of the pathologist indicate to any extent that it was a damaged disc material ?
A. He states simply that it’s cartilagenous tissue compatible with intervertebral disc.
Q. Did you give him the entire disc material or did you give him the cartila-genous material ?
A. No. I gave him everything that I got out. All the material that I removed.”
Dr. Levy, defendants’ expert, did not contradict the testimony to the effect that the surgeon, using the front approach, can determine if the disc is damaged although he may have trouble actually seeing if the disc impinges upon the nerve. We can not see that there is any reasonable inference other than that because the disc was damaged it was probably impinging the nerve root. Surely, the more probable inference is not that, though damaged, it did not impinge because the surgeon did not actually see the impingement. It appears that the former inference, that is, that the damaged disc impinged, justifies the medical profession in proceeding to remove the whole disc and necessitate fusion.
Defendants further argue that plaintiff’s complaints have persisted since the operation, thus supporting his position that the disc was not the problem. Dr. Kirgis admitted that he was not completely satisfied with plaintiff’s course of recovery since the operation, but there is no hard evidence that her condition subsequent to the operation definitely rules out the disc problem or shows that the operation was not justified. We know as a fact that these disc conditions do not result in overnight recoveries and in many cases residuals remain indefinitely. We are not convinced by the evidence on this point. After all, the disc was damaged, and the only known cause of the damage was the accident. If plaintiff still has other problems, to what do we attribute these other than the accident? She had no such problems before the accident. We think plaintiff has made out her case for a substantial award.
Both Drs. Levy and Kirgis gave her a 10 percent disability of the body as a whole. At trial time, she had been suffering intensely for over 18 months and is still suffering. The extent of her future suffering is yet unknown. Besides the initial hospitalization and the 20-day hospitalization for surgery, plaintiff was in the Oschner Foundation Hospital for 10 days in late April, 1974. Both the myelogram and the discogram are painful procedures and induce apprehension to a substantial extent. The disc operation actually involved two surgeries, one on the neck and the other on the hip. Plaintiff suffered an allergic reaction subsequent to the operation. The neck scar, although not hideous, definitely detracts from her appearance. The hip scar is not usually observed but is on the feminine anatomy and is an element of damage. The fusion will prevent full neck motion for the rest of her life and constitutes potential trouble to adjoining vertebrae in the future. Her day-to-day activities will probably be limited to a considerable extent for some time to come.
In view of all of the above consequences, we do not feel that the trial judge abused his discretion in awarding plaintiff wife $40,000 for her injuries. The jurisprudence mandates that it be left undisturbed unless it is so obviously excessive as to be beyond the “much discretion” accorded the trier of fact. We cannot so conclude.
Accordingly, for reasons assigned the judgment of the lower court is affirmed. All costs of this appeal are to be borne by appellants.
AFFIRMED.